**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| HORSHAM FIRE COMPANY NO. 1, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., GLOBE MANUFACTURING COMPANY, LLC,<br><br>Defendants. | Case No.: 0:26-cv-4586<br><br>**CLASS ACTION COMPLAINT**<br><br>(Demand for Jury Trial) |

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Horsham Fire Company No. 1 ("Plaintiff" or "Horsham"), individually and on behalf of all others similarly situated, brings this action against 3M Company (f/k/a Minnesota Mining and Manufacturing Company); EIDP, Inc.; DuPont de Nemours, Inc.; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and Globe Manufacturing Company, LLC (collectively, "Defendants"), alleging the following based upon the investigation of Plaintiff's counsel, information and belief, personal knowledge, and a review of publicly available information.

## INTRODUCTION

1. Plaintiff brings this Action on behalf of itself and a proposed Class that have purchased and used Defendants' specialized occupational personal protective equipment ("PPE")—including self-contained breathing apparatuses, hoods, helmets, coats, pants, gloves, boots, reflective tape, and other multilayered PPE ("Turnout Gear")—which are laden with highly toxic, carcinogenic, synthetic perfluorinated and polyfluorinated alkyl substances ("PFAS").

2. Per- and polyfluoroalkyl substances ("PFAS"), commonly known as "forever chemicals," are a class of synthetic chemical compounds characterized by exceptionally strong carbon-fluorine bonds that make them highly resistant to degradation. As a result, PFAS persist in the environment and the human body for extended, potentially indefinite periods, accumulate in living organisms, and may biomagnify through the food chain.[1] PFAS can migrate across environmental boundaries through surface water, groundwater, the atmosphere, and wildlife, and human exposure can occur through inhalation, ingestion, and dermal contact. Certain PFAS can also cross the placenta and be transferred to infants through breast milk. Their persistence, potential for bioaccumulation, and widespread environmental mobility make PFAS particularly difficult and costly to remediate.

---

[1] Paul E. Rosenfeld et al., Perfluoroalkyl substances exposure in firefighters: Sources and implications, 220 ENVIRON. RESEARCH (2023), https://doi.org/10.1016/j.envres.2022.115164.

3. The PFAS in the contaminated Turnout Gear ("PFAS Turnout Gear") leach, shed, crumble, abrade, off-gas, and otherwise migrate out of the PPE, causing unreasonably dangerous exposure and contamination of firefighters, fire stations, fire trucks, occupational equipment, personal property, firehouse furnishings, lockers and storage areas, laundering equipment and facilities, bunk rooms, other surrounding property, and other exposed employees and persons.[2]

4. When exposed to heat, ultraviolet light, water, and routine wear and handling, PFAS off-gas, break down, and degrade into highly mobile and toxic particles and dust,[3] further accelerating and increasing contamination of their surrounding environment and toxic human PFAS exposure.

5. Plaintiff and Class Members purchased the PFAS Turnout Gear to protect the health and safety of their firefighters from the extreme conditions of firefighting activities, such as the "thermal, physical, environmental, and bloodborne pathogen hazards encountered during structural firefighting operations."[4]

6. Instead, Defendants' PFAS Turnout Gear releases toxic PFAS that contaminate Class Members' firehouses and trucks and which are absorbed, inhaled, and ingested by Plaintiff's and other Class Members' firefighters and bioaccumulate in their

---

[2] Anna S. Young et al., Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust, J. EXPO. SCI. & ENVIRON. EPIDEMIOLOGY (2021), https://www.nature.com/articles/s41370-021-00288-7.

[3] *Id.*

[4] Andrew Maizel et al., Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/per-and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

bodies, resulting in unreasonable toxic exposure known to cause cancer, disease, and other harmful health conditions.

7. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[5] That change directly corresponds to the timing of Defendants' addition of PFAS to PPE and their commercialization of PFAS Turnout Gear.

8. Occupational cancer is the leading cause of line-of-duty deaths in the fire service. Seventy percent of firefighters are predicted to eventually die from cancer, which is significantly higher than the general population.[6]

9. Facing mounting publicly available peer-reviewed studies, increased public awareness, demands for transparency and disclosure, and growing state-law prohibitions on PFAS in Turnout Gear, Defendants are finally beginning to publicly acknowledge that PFAS, especially the concentrations included in Turnout Gear, are unreasonably dangerous. Thus, Defendants have recently been shifting their focus to monetizing the need for PFAS-free Turnout Gear.

10. The nature of the Turnout Gear industry, including its standards and certification processes, requires Defendants to share information, agree to materials, and

---

[5] *Id.*

[6] Graham F. Peaslee et al., Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles, Environmental Science & Technology Letters 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

cooperate in the design, manufacture, promotion, sale, and commercialization of finished Turnout Gear.

11. As explained by textile manufacturer Milliken: "Milliken saw the writing on the wall and got to work."[7] The "writing on the wall" Milliken was referring to was "[t]he growing chorus of concern over the last several years from firefighters, lawmakers, insurers, and environmentalists[, which] has all but guaranteed that use of PFAS was going away sooner rather than later."[8]

12. 3M Company ("3M") announced it would halt production of PFAS chemicals and work to phase out PFAS in all its products by the end of 2025.[9] Upon information and belief, 3M would not have made this announcement unless it knew there were safer alternatives to PFAS in Turnout Gear.

13. At least as of 2025, there are available in the marketplace PFAS-free Turnout Gear that comply with the water-repellent and heat-resistive characteristics and industry standards for firefighter PPE embodied in applicable National Fire Protection Association ("NFPA") standards.

---

[7] Milliken, Why is PFAS used in firefighters protective gear, https://www.milliken.com/en-us/businesses/textile/blogs/why-is-pfas-used-in-firefighters-protective-gear (last accessed Feb. 6, 2026).

[8] Jesse Roman, Consequential changes to firefighter personal protective equipment (PPE), NATIONAL FIRE PROTECTION ASSOC. J. (Apr. 16, 2025), https://www.nfpa.org/news-blogs-and-articles/nfpa-journal/2025/04/14/deadline-pressure.

[9] 3M, 3M's PFAS Stewardship, https://www.3m.com/3M/en_US/pfas-stewardship/uses-applications/?utm_medium=redirect&utm_source=vanityurl&utm_campaign=pfas.3m.com/pfas_uses (last accessed Feb. 6, 2026).

14. Toxic PFAS contamination is ongoing and escalating. Unless and until the PFAS Turnout Gear is destroyed and disposed of, and contaminated property effectively remediated, the unreasonably dangerous toxic exposure and contamination will continue—even escalating with additional use and handling—causing ongoing injuries and damage to firefighters, fire stations, property, and the surrounding environment.

15. Fire departments exist and are maintained for the safety, health, and general welfare of the public. Plaintiff's and Class Members' firefighters perform their fire protection and emergency services for the safety, health, and welfare of the public.

16. Plaintiff is asserting public rights and public interests in pursuing statutory and common law remedies against Defendants to recover the costs of remediation, repair, and replacement of property contaminated by PFAS—including replacement of PFAS Turnout Gear—and elimination of the ongoing toxic exposure of Plaintiff's and Class Members' firefighters and other persons exposed to unreasonably dangerous PFAS that are known to cause cancer and other serious harms to human health.

## PARTIES

### I. Plaintiff

17. Plaintiff Horsham Fire Company No. 1 is a combination fire department providing fire suppression, emergency medical services, and fire police to Horsham Township located in the state of Pennsylvania. Plaintiff integrates volunteer firefighters and career personnel, comprising approximately 65 personnel in total. Over the last four years, Plaintiff has purchased Turnout Gear containing PFAS-contaminated products

manufactured by Defendants. The outer shell, moisture barrier, thermal liner, and other components of the Turnout Gear Plaintiff purchased contained PFAS-contaminated textiles or other components designed, manufactured, marketed, distributed, applied, and/or sold by Defendants.

## II. Defendants

18. For decades, PFAS Turnout Gear has been designed, tested, manufactured, marketed, sold, and applied through the collective, organized, and highly interdependent contributions of Defendants, each of which contribute a necessary and essential component, material, chemical, or related service without which the PFAS Turnout Gear could not be produced and sold. Each Defendant knows and intends that its products and services will be combined to create the final PFAS Turnout Gear purchased by Plaintiff and the Class for use by their firefighters in Massachusetts.

### A. PFAS Chemical Finish Defendants

19. Defendants EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. (collectively, "DuPont") and 3M (together with DuPont, the "PFAS Chemical Finish Defendants") design, manufacture, market, and sell PFAS performance chemicals for high-hazard clothing, including durable water-and-oil repellants, fluorochemical finishes, coatings, surfactants, adhesives, fluoropolymer dispersions, membrane coatings, adhesion promoters, finishing sprays, repellency boosters, and durable water repellant coatings; as well as other PFAS performance chemicals applied to the fabrics, textiles, adhesives, reflective tape, and

assembled Turnout Gear (e.g., PFAS tapes, adhesives and finishing sprays) (collectively, "PFAS Chemical Finishes").

20. PFAS Chemical Finish Defendants make the PFAS molecules, such as fluorotelomer alcohols (FTOHs), fluorinated acrylates, perfluorinated surfactants, and side-chain fluorinated polymers, which are the building blocks of the PFAS Chemical Finishes.

21. All PFAS Turnout Gear purchased by Plaintiff and the proposed Class contains PFAS Chemical Finishes designed, manufactured, marketed, and sold by at least one, and often both, PFAS Chemical Finish Defendants.

22. PFAS Finish Defendants invented, developed, and commercialized PFAS Chemical Finishes into an essential component in the billion-dollar Turnout Gear industry.

**1. Defendant 3M**

23. Defendant 3M, formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States. 3M has its principal place of business in St. Paul, Minnesota.

24. 3M's PFAS Chemical Finishes were among the earliest used in Turnout Gear and included perfluorooctane sulfonate ("PFOS"), PFOS-based surfactants and repellants, and Scotchgard fluorochemical repellents (legacy versions).

25. In addition to PFAS Chemical Finishes, 3M invented, designed, manufactures, markets, and sells 3M Scotchlite Reflective Tape, which contains PFAS and is used on the PFAS Turnout Gear purchased and used by Plaintiff and members of the proposed Class.

26. 3M was the dominant manufacturer and supplier of PFAS Chemical Finishes until 2002 and is still the world's largest PFAS tape and adhesive manufacturer.

**2. Defendant DuPont**

27. Defendant EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States. EIDP, Inc. has its principal place of business in Wilmington, Delaware.

28. Defendant DuPont de Nemours, Inc., is a Delaware corporation that does business throughout the United States. DuPont de Nemours, Inc. has its principal place of business in Wilmington, Delaware.

29. Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States. Chemours has its principal place of business in Wilmington, Delaware. In 2015, EIDP, Inc. spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain EIDP, Inc. assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS chemicals that are the subject of this Action.

30. Defendant The Chemours Company FC, LLC, ("Chemours FC") is a Delaware corporation that does business throughout the United States. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures the PFAS chemicals that are the subject of this Action.

31. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States. Corteva has its principal place of business in Wilmington, Delaware. In 2019, DuPont de Nemours, Inc., spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds EIDP, Inc. as a subsidiary. In connection with these transfers, Corteva assumed certain EIDP, Inc. assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS chemicals that are the subject of this Action.

32. In 2002, PFOS were phased out and DuPont replaced 3M as the dominant supplier of fluorotelomer alcohols (FTOHs), C6 fluorotelomer acrylates, Zonyl™ fluorochemical repellents, and Capstone™ repellents—all of which are PFAS.

**B. PFAS Turnout Gear Assembler Defendant**

33. PFAS Turnout Gear assemblers put together component materials to create the final, finished PFAS Turnout Gear they then sell under their respective brand names to Plaintiff and Class Members. They source outer shells, moisture barriers, and thermal liners from other producers in the supply chain; cut, sew, laminate, and assemble the components; apply additional treatments or finishes, including PFAS Chemical Finishes; brand the Turnout Gear under their own names; and certify the final Turnout Gear product to NFPA standards.

34. Although the outer shell, moisture barrier, and thermal liners already contain PFAS, the PFAS Turnout Gear assemblers apply additional PFAS Chemical Finishes after cutting and sewing. For example, PFAS Turnout Gear assemblers apply PFAS Chemical

Finishes to the outer shell and reinforcements to enhance repellency and increase stain, oil, and chemical resistance.

35. PFAS Turnout Gear assemblers add extra concentrated applications of PFAS Chemical Finishes; apply adhesives and seam tapes to seal moisture-barrier seams and reinforce stress points; and bond reflective trim, bonding patches, labels, and structural reinforcements, including at the knees, elbows, cuffs, and pockets.

36. PFAS adhesives contain fluorinated acrylic polymers, fluorotelomer-based surfactants, PFAS-modified urethanes and polytetrafluoroethylene ("PTFE")-filled adhesive film.

37. PFAS Turnout Gear assemblers apply PFAS-based repellency boosters and PFAS-based anti-static or anti-soiling sprays to the final, finished Turnout Gear. PFAS Turnout Gear assemblers also use PFAS-containing lubricants on sewing equipment.

38. PFAS glues, bonding agents, and lamination adhesives used by PFAS Turnout Gear assemblers during assembly are not reported in fabric Material Safety Data Sheets but nevertheless substantially increase the total PFAS load in the finished Turnout Gear.

**1. Defendant Globe**

39. Defendant Globe is a New Hampshire corporation that does business throughout the United States. Globe has its principal place of business in Pittsfield, New Hampshire.

40. Globe manufactures and assembles PPE with the PFAS chemicals that are the subject of this Action. Plaintiff purchased and used PFAS Turnout Gear designed, assembled, manufactured, marketed, and sold by Defendant Globe.

## JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action in which the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from each Defendant.

42. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because many of the actions giving rise to this Complaint took place within this District.

43. This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts in the State of Minnesota and/or committed overt acts in furtherance of the conduct alleged herein throughout the State of Minnesota. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business in the State of Minnesota.

44. Each named Defendant has proximately injured Plaintiff and Class Members, as alleged herein.

45. Defendants expected or should have expected their actions to have consequences in Minnesota. Defendants purposefully availed themselves of the privilege

of conducting activities in Minnesota, thus invoking the benefits and protections Minnesota laws.

46. Each named Defendant derives substantial revenue from the sale of PFAS-contaminated Turnout Gear that is the subject of this Action.

## FACTUAL ALLEGATIONS

### I. The History of PFAS and Their Effects on Human Health and the Environment.

47. Defendants 3M and DuPont created PFAS in the late 1930s and early 1940s.

48. By the 1950s, they had commercialized PFAS chemicals into very lucrative "performance chemicals."

49. At all relevant times, Defendants DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries, sharing research, development, critical data, investigative results, performance measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

50. PFAS do not exist naturally in the environment, and prior to Defendant DuPont and 3Ms' invention and commercialization, they had never been found in the environment or human body.

51. PFAS Turnout Gear contains substantially higher concentrations of PFAS than any other comparable industrial, occupational, or consumer apparel, gear, and PPE.

52. PFAS Turnout Gear has particularly high concentrations of toxic PFAS in the fluoropolymer moisture barriers, PFAS-based water and oil repellants, PFAS-treated aramid blends and aramid fabrics, and PFAS-containing adhesives and membranes.

53. PFAS concentrations in fluorinated polymer-treated textiles have been shown to increase with weathering.[10]

54. Defendants add PFAS to PFAS Turnout Gear in high concentrations and in multiple layers. They do so with the knowledge that the added PFAS are highly toxic and carcinogenic and would not remain contained in the PFAS Turnout Gear, but would leach into the skin of firefighters through transdermal absorption when worn, would off-gas into the air and be inhaled by firefighters and exposed persons, would abrade and crumble onto property and be inhaled or ingested by firefighters and other exposed persons, and would otherwise migrate and contaminate the surrounding environment and property.

55. PFAS in the PFAS Turnout Gear do not remain contained or stable, rather their concentrations and migration increase dramatically when exposed to physical stressors associated with firefighting activities, such as during abrasion, heat, and weathering.[11]

[10]Andrew Maizel et al., Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/per-and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

[11]Andrew Maizel, et al., Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/per-and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

56. PFAS-migration science shows that PFAS do not remain bound within the Turnout Gear; instead, they continuously shed, volatilize, abrade, and leach from the Turnout Gear during normal use, storage, handling, and laundering.

57. Once released, PFAS bind weakly to surfaces and readily contaminate station floors, gear rooms, apparatus bays, fabrics, drains, wastewater, dust, and soil.

58. Because PFAS are chemically stable, water-soluble, and highly mobile, even small releases accumulate over time, creating persistent contamination that spreads through HVAC systems, wash water, runoff, and porous building materials. This migration is inherent to the chemical properties of PFAS-treated textiles and fluoropolymer membranes, meaning contamination occurs without misuse, damage, or extraordinary conditions.

59. PFAS are known immunotoxins and carcinogenic compounds that cause multiple harmful effects, including environmental and property contamination and a substantial risk of injury to the health and safety to humans and other animals.

60. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to be absorbed and bioaccumulate in the human body.

61. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

62. Generally accepted peer-reviewed scientific research found that PFAS exposure, even in minute quantities, is considered hazardous to human health, and is linked to multiple serious adverse health effects in humans, including various cancers, tumors,

liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

63. PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the U.S. Environmental Protection Agency ("EPA"), Agency for Toxic Substances and Disease Registry, National Institute of Environmental Health Sciences, Environmental Council of the States, the European Environmental Agency, Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

64. The International Agency for Research on Cancer has classified one type of PFAS—perfluorooctanoic acid ("PFOA")—as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and evidence it can cause cancer in lab animals.

65. PFAS exposure in any detectable amount is considered hazardous to human health and is known to cause serious adverse health outcomes, which include, but are not limited to, various types of cancer, changes in bodily functions, reproductive harms, developmental defects, and more.

## II. Firefighters' Exposure to PFAS.

66. At the 2022 International Association of Fire Fighters ("IAFF") Fallen Fire Fighter Memorial, almost 75% of the names added to the wall (348 out of 469) were members who had died from occupational cancer.

67. There are established links between PFAS and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract more than the general public.[12]

68. A 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), found significant quantities of PFAS in every layer of both new (i.e., still in the original packaging) and used Turnout Gear collected from firefighters across the United States.[13]

69. "Startlingly, a garment-to-hand transfer of total fluorine. .. was also observed when researchers simply manipulated the textiles in [the] laboratory," which strongly supports the premise that side-chain fluoropolymers and the PFAS they bind release to the environment upon wear.[14]

70. Lead researcher Graham Peaslee commented that firefighter Turnout Gear is composed of "the most highly fluorinated textiles [he had] ever seen"[15] and that the levels of PFAS in the Turnout Gear means the firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high."[16]

---

[12]Graham F. Peaslee, et al., Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles, Environmental Science & Technology Letters 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

[13]*Id.*

[14]*Id.*

[15]Raleigh McElvery, Protective Gear Could Expose Firefighters to PFAS, CHEMICAL AND ENGINEERING NEWS (July 1, 2020).

[16]Andrew Wallender, Firefighters Face New Possible Risk From Toxic PFAS: Their Gear, BLOOMBERG LAW (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

71. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters with dermal absorption through direct contact between the firefighters' skin and PFAS Turnout Gear being "a key exposure route."[17] Extensive scientific research and studies have demonstrated that firefighter exposure through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear presents a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.[18]

72. Multiple biomonitoring studies show that firefighters often have substantially higher levels of certain PFAS in serum than the general population.[19]

73. Turnout Gear is increasingly recognized as a potential source of PFAS exposure amongst firefighters.[20]

---

[17]G.E. CAMPBELL ET AL., PFAS-FREE MOISTURE BARRIERS IN STRUCTURAL FIREFIGHTING GEAR, IN TOWARD A PFAS-FREE FUTURE: SAFTER ALTERNATIVES TO FOREVER CHEMICALS, (Simona A Bălan et al. es., Nov. 17, 2023).

[18]Nur-Us-Shafa Mazumder, et al., Firefighters' exposure to per-and polyfluoroalkyl substances (PFAS) as an occupational hazard: A review, FRONT MATTER (2023), https://www.frontiersin.org/journals/materials/articles/10.3389/fmats.2023.1143411/full.

[19]Grace Campbell, et al., Replacing PFAS in Firefighter Turnout Gear, UC BERKELEY (2022), https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf; National Institute of Standards, Researchers Pin Down PFAS Prevalence in Firefighter Gear, NIST (May 1, 2023), https://www.nist.gov/news-events/news/2023/05/researchers-pin-down-pfas-prevalence-firefighter-gear.

[20]Andrew Maizel, et al., Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/per-and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

74. In 2021, the U.S. Congress responded to growing concerns that soaring rates of occupational cancers among firefighters may be directly caused by PFAS exposure from PFAS Turnout Gear by directing NIST to study the prevalence of PFAS in Turnout Gear.

75. In or around 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with IAFF, conducted a semester-long study into safer alternatives to PFAS in Turnout Gear and offered multiple alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of Turnout Gear.

76. A pair of NIST studies, released in May 2023 and January 2024, found that Turnout Gear not only contains cancer-causing PFAS, but also that Turnout Gear releases even more PFAS when subject to simulated wear and tear.[21]

77. In September 2024, the NFPA introduced NFPA 1970-2025, restricting the use of PFAS in Turnout Gear and requiring special testing and certification.

78. In 2024, the states of Massachusetts and Connecticut passed laws 1) requiring notice beginning in 2025 to any person, local government, or state agency as to whether PFAS is contained in firefighter PPE being sold in either state; and 2) beginning on January 1, 2027, in Massachusetts, and in 2028 in Connecticut, banning the sale of any firefighter PPE containing PFAS.[22]

---

[21] B. Hayes, Wear and Tear May Cause Firefighter Gear to Release More 'Forever Chemicals', NIST (Jan 16, 2024), https://www.nist.gov/news-events/news/2024/01/wear-and-tear-may-cause-firefighter-gear-release-more-forever-chemicals.

[22] Massachusetts General Laws, Chapter 182, Acts of 2024, An Act Relative to the Reduction of Certain Toxic Chemicals in Firefighter Personal Protective Equipment;

79. On August 15, 2025, Illinois enacted the Deputy Chief Pete Bendinelli PFAS PPE Act—named for longtime Calumet City Firefighters Local 621 member Pete Bendinelli, who died from cancer in 2025—requiring notices of PFAS in Turnout Gear beginning in 2026 and prohibiting the manufacture, sale, and distribution of PFAS Turnout Gear beginning in 2027.

80. Illinois Rep. Mike Kelly, who co-sponsored the newly enacted Illinois state law, explained: "Little did we know that the actual gear designed to protect us is actually killing us."[23]

81. The Illinois PFAS Reduction Act is another worker-protection and cancer-prevention measure that acknowledges the toxicity of PFAS, the unnecessary inclusion of PFAS in Turnout Gear, the need for transparency from Defendants related to PFAS in their Turnout Gear, enhanced enforcement authority for the attorney general, and expanded Illinois Environmental Protection Agency Authority. PFAS Reduction Act, 415 Ill. Comp. Stat. 170/5, 170/20 (2025), as amended by Pub. Act 104-221.

82. In May 2024, San Francisco passed an ordinance banning PFAS in Turnout Gear and requiring replacement by June 2026. San Francisco completed the first purchase of 1,100 sets of non-PFAS turnout gear in December 2025, which will provide one set for

---

Connecticut Acts of 2024 Public Acts 24-59, An Act Concerning the Use of PFAS in Certain Products.

[23]International Association of Fire Fighters, Illinois banns PFAS in fire fighter gear with new law, (Aug. 29, 2025), https://www.iaff.org/news/illinois-bans-pfas-in-fire-fighter-gear-with-new-law/.

every frontline suppression member. The cost of the new non-PFAS turnout gear exceeded $4.5 million dollars.

83. In announcing the purchase of the non-PFAS turnout gear, the San Francisco Fire Chief, Dean Crispen, underscored the importance of providing PFAS-free turnout gear: "Transitioning to PFAS-free equipment is a critical step in advancing our mission: safeguarding the public by ensuring our firefighters remain healthy and able to serve at their highest capacity. .. . By investing in the well-being of our firefighters, we strengthen the health, resilience, and safety of San Francisco as a whole."[24]

84. IAFF affirmed the importance of laws such as those passed in Illinois, Connecticut, and Massachusetts, stating in part that: "Reducing carcinogenic exposure from protective gear is a key part of the IAFF's ongoing mission to combat the cancer epidemic in the fire service."[25]

85. The National Fallen Firefighters Foundation, International Association of Fire Chiefs, Volunteer and Combination Officers Section, and National Volunteer Fire Council have affirmed that occupational cancer is a serious threat to firefighters.

[24]Mayor Lurie Announces San Francisco Fire Department Will Become Largest in U.S. to Adopt Safe Firefighting Gear, SF.GOV (Dec. 11, 2025), https://www.sf.gov/news-mayor-lurie-announces-san-francisco-fire-department-will-become-largest-in-us-to-adopt-safe-firefighting-gear

[25]*Id.*

86. NIST, IAFF, and U.S. Fire Administration warn that PFAS in Turnout Gear are "potentially cancer-causing chemicals" linked to cancer and other serious effects.[26]

87. Firefighters, advocacy groups, unions, government agencies, and scientific bodies are aligned in identifying PFAS Turnout Gear as a significant PFAS-exposure pathway and a catastrophic hazard to human health.

88. PFAS cannot be used safely as a component of Turnout Gear.

**A. Defendants' Knowledge of PFAS Toxicity**

89. Although the general public is just beginning to discover the catastrophic impact of PFAS on the environment and human health, Defendants have known about the toxicity of PFAS for decades. Moreover, Defendants shared information amongst and between themselves while affirmatively misleading and actively concealing data and information about the risks of PFAS exposure and their propensity to contaminate surrounding property.

90. Defendants knowingly and intentionally added high concentrations of PFAS to Turnout Gear, despite knowing: (1) that PFAS exposure has catastrophic health effects; (2) that the PFAS would migrate from the Turnout Gear and contaminate and harm surrounding property and persons; (3) that PFAS concentrations and migration would increase with normal use and handling of the Turnout Gear and with exposure to the

[26] U.S. Fire Administration, New Information on Potential Carcinogens in Firefighter Gear (May 11, 2023), https://www.usfa.fema.gov/blog/carcinogens-in-firefighter-gear/?utm_source=copilot.com.

extreme stressors typically encountered as part of firefighting; and (4) that there was no safe way to use PFAS as a component in Turnout Gear.

### 1. Defendant 3M has long known of the dangers of PFAS.

91. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

92. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. 3M discussed the findings of these studies internally and often shared them with DuPont, but it did not publicize or share the findings with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c. By the 1970s, 3M had documented PFAS in fish and was aware that PFAS were hazardous to marine life.

d. In 1975, 3M learned there was "universal presence" of PFAS in human blood samples taken from across the United States.

e. In 1976, 3M began monitoring its employees' blood for PFAS because the company was concerned about potential health effects.

f. In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and

gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g. In 1978, 3M had to abort a study when all the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h. In 1979, an internal 3M report discussing the studies on PFOA and PFOS states that PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies. .. be undertaken as soon as possible."[27]

i. In 1979, an internal 3M memo concluded it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[28]

j. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal research showing that PFAS were causing birth defects in rats.

k. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

---

[27]Sharon Lerner, 3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show, THE INTERCEPT (July 31, 2018).

[28]*Id.*

l. In 1989, a review of mortality data amount 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

93. Section 8(e) of the Toxic Substances Control Act ("TSCA") required chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment."[29] This reporting requirement has been included in the TSCA since its enactment in 1976.[30]

94. Despite decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

95. In 1998, the EPA first learned PFAS were in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

96. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

97. In 2022 and following a multi-year probe into both companies, the state of California announced it was suing 3M, along with DuPont, for manufacturing PFAS with

[29]TSCA § 8(e); 15 U.S.C. § 2607(e).

[30]See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[31]

98. The same year, 3M reported to the State of Maine that it sold more than 20,000 products containing PFAS in the United States in 2021 and 2022.[32] Those products included Scotchlite reflective tape, which can be found on all Turnout Gear purchased by Plaintiff.

**2. Defendant DuPont has long known of the dangers of PFAS.**

99. Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

100. DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

101. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried about the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[33]

---

[31]CNN Business, California sues 3M, DuPont over toxic 'forever chemicals' (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

[32]See Defend Our Health, More 'Forever Chemicals' Reported in Products Sold in Maine, https://defendourhealth.org/news/more-forever-chemicals-reported-in-products-sold-in-maine/#:~:text=The%203M%20Company%2C%20which%20also,%C2%AE%20Flex%20Write%20Surface%20sheets (last accessed Feb. 6, 2026).

[33]Sharon Lerner, The Teflon Toxin: DuPont and the Chemistry of Deception, THE INTERCEPT (Aug. 11, 2015).

102. In 1954, DuPont employee R.A. Dickinson noted he had received an inquiry regarding PFOA's "possible toxicity."[34]

103. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a. In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various organs in rats.[35]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies indicating that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to poison.

c. In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later in the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

---

[34] *Id.*
[35] *Id.*

d. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[36]

e. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study suggesting an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[37]

g. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided

---

[36] *Id.*
[37] *Id.*

against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[38]

i. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.[39]

104. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.[40]

105. In 2001, a class-action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

106. In 2003, a consultant service with experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

---

[38]Nathaniel Rich, The Lawyer Who Became DuPont's Worst Nightmare, NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[39]Sharon Lerner, 3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show, INTERCEPT (July 31, 2018).

[40]Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
>
> …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[41]

107. In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute—$10.25 million—and required DuPont to perform supplemental environmental projects worth $6.25 million.

108. In 2015, DuPont spun off its "performance chemicals" business, two-thirds of its environmental liabilities, and 90% of its active litigation to Defendant Chemours.

---

[41]Letter from P. Terrance Gaffney, Esq. of the Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (Apr. 29, 2003), https://cdn.toxicdocs.org/QX/QXnogko6Eaqd8wNkE3Mj7rvRo/QXnogko6Eaqd8wNkE3Mj7rvRo.pdf.

109. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

110. In 2022 and following a multi-year probe into both companies, the state of California announced it was suing DuPont and 3M for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role—claiming it had never manufactured PFOA, PFOS, or firefighting foam—and maintain that California's claims were without merit: "We believe this complaint is without merit, and we look forward to vigorously defending our record of safety, health and environmental stewardship."[42]

### 3. Every player in the industry also knew of the dangers of PFAS.

111. The remaining Defendants and other participants in the supply chain for PFAS Turnout Gear also knew or should have known of the dangers of PFAS.

112. Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or otherwise—their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

---

[42] California sues 3M, DuPont over toxic 'forever chemicals', CNN BUSINESS (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

113. Indeed, in 2023, Defendant Globe's Chief Operating Officer applauded a New Hampshire bill titled the "PFAS Alternatives Act," recognized "the demand for PFAS-free materials," and stated that "Globe looks forward to continuing its long-term advocacy efforts. .. to promote this investment in innovation and pass the PFAS Alternatives Act."[43]

114. Moreover, in the early 2020s, as the toxic-exposure risk to products containing PFAS became more generally known, all Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles.

115. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable-clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car-seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal-care companies (e.g., Johnson & Johnson and Oral-B), and textile-manufacturing companies.

116. All Defendants knew or should have known that Turnout Gear containing PFAS posed a substantial risk of injury to the health and safety of firefighters in that it

[43]Globe Manufacturing Company Supports Bipartisan PFAS Alternatives Act, PR NEWSWIRE (July 20, 2023), https://www.prnewswire.com/news-releases/globe-manufacturing-company-supports-bipartisan-pfas-alternatives-act-301882343.html#:~:text=Globe%20Manufacturing%20Company%20is%20a%20New%20Hampshire%2Dbased,industry%20meet%20firefighters'%20call%20for%20PFAS%2Dfree%20gear.

placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

117. All Defendants knew or should have known that exposure to PFAS and PFAS-contaminated materials places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

118. All Defendants knew or should have known that the PFAS Turnout Gear, which they manufactured, distributed, marketed, offered for sale, and/or sold, would be used in ways that would expose firefighters to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

## IV. PFAS Require Specialized Destruction and Disposal.

119. Improper destruction and disposal of PFAS can compound the harms caused by PFAS through concentration, accumulation, increased migration, and the creation of harmful byproducts.

120. Remediating PFAS contamination is costly and requires substantial resources.

121. Plaintiff and Class Members cannot simply vacuum up PFAS contamination and dispose of contaminated property in normal trash bins. PFAS remediation requires testing, monitoring, and specialized retrieval, clean-up, destruction, and disposal procedures, which must adhere to applicable state and federal regulations. Proper containment and eradication of firefighters' PFAS exposure must also comply with Occupational Safety and Health Act obligations.

122. The EPA's 2024 updated Interim Guidance on the Destruction and Disposal of PFAS[44] states that PFAS-containing materials require controlled disposal methods such as: engineered landfills with leachate collection, thermal destruction under specific conditions, and underground injection. The EPA emphasizes the need to prevent PFAS from entering the environment and explicitly frames PFAS as a "waste stream" requiring specialized handling.

## V. Defendants Failed to Warn Plaintiff and Class Members of PFAS Risks.

123. As alleged above, Defendants knew or should have known that PFAS Turnout Gear containing PFAS was extremely dangerous to firefighters in that it placed them at an increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants did not disclose to Plaintiff or Class Members the full extent of those health risks or provide warnings to Plaintiff or Class Members regarding those risks.

124. Instead, Defendants continued to misrepresent the safety of PFAS Turnout Gear and engaged in campaigns aimed at misinforming and lessening public and regulatory concern regarding the dangers posed by PFAS in Turnout Gear.

[44] U.S. Environmental Protection Agency, Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances—Version 2 (Apr. 8, 2024), https://www.epa.gov/system/files/documents/2024-04/2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

125. Defendant 3M publicly advertised that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[45]

126. Indeed, in a 2022 statement, 3M claimed: "While some studies have linked legacy fluorochemicals to some conditions at very high doses not typically found in everyday life, researchers from around the world have studied these materials for decades and haven't found a definitive causal link between PFOA or PFOS exposure and any health condition."[46]

127. Also in 2022, 3M announced it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, Mike Roman, 3M's Chairman and Chief Executive Officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[47] In connection with the announcement, and prior to the alleged phase out/discontinuation of PFAS, 3M maintained that "3M's products are safe for their intended uses."[48]

128. As recently as November 2025, Defendant DuPont maintained and publicly advertised that:

[45] Benji Jones, You probably have "forever chemicals" in your body. Here's what that means, VOX (updated June 23, 2023), https://www.vox.com/2022/8/25/23318667/pfas-forever-chemicals-safety-drinking-water.

[46] Statement from 3M to Vox.com regarding PFAS, 3M (last accessed Feb. 5, 2026), https://cdn.voxcdn.com/uploads/chorus_asset/file/23968894/Statement_from_3M_to_Vox.pdf.

[47] 3M to Exit PFAS Manufacturing by End of 2025, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.

[48] *Id.*

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacturer, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[49]

129. Defendant Chemours maintained and publicly advertised that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030."

130. Chemours further maintained and publicly advertised that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[50]

131. In 2022, Defendant 3M publicly stated it was not necessary or appropriate to declare any PFAS hazardous.

132. Defendants, together with other players in the supply chain of PFAS Turnout Gear, have repeatedly represented to Plaintiff, Class Members, and the public that their

---

[49] DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS), DUPONT (archived Nov. 16, 2025), https://web.archive.org/web/20251116202029/https://www.dupont.com/pfas.html.

[50] Our Commitment to Responsible Chemistry, CHEMOURS, https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship (last accessed Feb. 6, 2026).

products were safe for their intended uses, including the ways in which firefighters were expected to use, clean, and store the PFAS Turnout Gear.

133. For example, Defendant DuPont maintained and publicly advertised that Turnout Gear manufactured with DuPont's materials "work[s] hard to help keep your professionals safe, inside and out," "help[s] protect professionals even when the fire is out," and "are helping keep first responders safe."

134. Defendant Globe maintained and publicly advertised that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

135. In 2017, Turnout Gear assembler Lion Group, Inc.'s ("Lion") President wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's retraction of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish. .. . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts. .. would not have posed any health risks to firefighters. There is absolutely no connection at all between

> PFOS and firefighter turnout gear.. .. We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks.. .. However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters.

136. In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

137. In 2019, textile manufacturer W.L. Gore & Associates issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [Turnout Gear] are insignificant."

138. As alleged above, the Turnout Gear purchased by Plaintiff and Class Members did not contain appropriate labelling information or warnings, including information or warnings:

a. indicating that the gear contained or may contain PFAS;

b. indicating that PFAS migrate out of the Turnout Gear and contaminate the surrounding environment, property, and persons;

c. regarding the health risks associated with exposure to PFAS; or

d. regarding necessary and proper handling, transport, storage, destruction, and disposal of PFAS Turnout Gear and property contaminated by it.

139. Labels on Defendants' PFAS Turnout Gear did not adequately disclose that the Turnout Gear contained PFAS or PFAS-containing materials, and contained no adequate warning that handling, cleaning, using, or storing the Turnout Gear as it was intended to be handled, cleaned, used, or stored, could result in exposure to PFAS and adverse effects to human health.

140. Defendants expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach those ultimate users.

141. At the time of purchase of such PFAS Turnout Gear, Defendants did not adequately disclose or warn Plaintiff or Class Members regarding the full extent of the existence or use of PFAS in their Turnout Gear; the full nature and extent of the substantial threat and risk of harm to the health and safety of the firefighters and others posed by the handling, cleaning, using, and storage of the PFAS Turnout Gear; that the PFAS Turnout Gear was unreasonably dangerous to firefighters and others during its expected handling, cleaning, use, and storage; or that the Turnout Gear should not be purchased or otherwise acquired by Plaintiff or Class Members.

142. Defendants misrepresented, through public statements and concealment of information known to them, that the use of PFAS in the Turnout Gear did not make PFAS Turnout Gear unsafe or unreasonably dangerous for its intended use, handling, cleaning, and storage.

143. Defendants failed to inform Plaintiff and the Class Members of the inherent danger and substantial risk to health and safety posed by the PFAS Turnout Gear.

Defendants failed to inform Plaintiff and Class Members that PFAS continuously escape from the PFAS Turnout Gear and contaminate the surrounding persons and property; that PFAS concentrations and contamination increase with use, wear-and tear, laundering and exposure to the extreme conditions of firefighting duties; and of the risk of injury or harm to human health posed by the expected use, handling, cleaning, and storage of the PFAS Turnout Gear.

144. In acting as alleged herein, Defendants deprived Plaintiff and the Class Members of the information necessary to make informed business decisions regarding the purchase of Turnout Gear and to take reasonable and necessary steps to protect their personnel and property from toxic contamination caused by the ordinary and expected use, handling, cleaning, and storage of PFAS Turnout Gear.

## VI. Defendants Had the Ability to Design and Manufacture Safer Turnout Gear.

145. Despite Defendants' express position that PFAS were "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS.

146. In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into Turnout Gear to comply with industry standards regarding durability, water-repellency, and heat-resistant characteristics.

147. Indeed, as of 2025, there is available in the market PFAS-free Turnout Gear that complies with the water-repellent, heat-resistant, and other industry standards for firefighter PPE.

148. Milliken now admits that PFAS are not necessary components of Turnout Gear ensembles and even poses the question on its website: "So what will you lose when you make the shift to non-PFAS gear?" and then answers that question: "Just the PFAS."[51]

149. PFAS-free Turnout Gear could have been available earlier if Defendants had not delayed innovation until public pressure mounted and had not chosen profits over health, safety, and welfare of the firefighters and the public.

## CLASS ALLEGATIONS

150. Plaintiff brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following (the "Class"):

> All fire companies, and other public or private entities in the Commonwealth of Pennsylvania that, during the relevant time period, purchased turnout gear containing PFAS that was manufactured, distributed, applied, utilized, marketed, and/or sold by Defendants.

Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the Class definition based on additional information obtained through further investigation and discovery and/or to address or accommodate any concerns raised by the Court.

151. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as

---

[51] How non-PFAS fabric impacts the performance of turnout gear, MILLIKEN, https://www.milliken.com/en-us/businesses/textile/blogs/how-non-pfas-fabric-impacts-the-performance-of-turnout-gear (last accessed Feb. 9, 2026).

Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

152. Ascertainability. The proposed Class is readily ascertainable because it is defined clearly and uses objective criteria, thereby permitting Class Members to determine if they are part of the Class. Members of the Class can be identified readily through records and information in Defendants' possession, custody, or control.

153. Numerosity. The Class is so numerous that joinder of individual members is impracticable. Although the exact number of members of the Class is not known to Plaintiff at this time, on information and belief, there are likely well over 350 fire departments and 750 fire stations in Massachusetts.

154. Commonality and Predominance. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including, but not limited to:

a. Whether Defendants' conduct resulted in the availability of Turnout Gear in the marketplace that was unreasonably dangerous for its intended and expected use, handling, cleaning, and storage;

b. Whether members of the Class suffered the same or substantially similar injury or damage;

c. Whether equity and law require that Defendants share in the cost of the remedy, namely: (1) the retrieval, removal, and proper disposal of PFAS-treated and/or contaminated Turnout Gear; and (2) providing each Class Member with sufficient funds to replace its contaminated Turnout Gear with Turnout Gear that meets the industry standards.

155. Typicality. Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' course of conduct as described herein. The injuries of Plaintiff and Class Members were directly caused by Defendants' wrongful conduct, and Plaintiff and Class Members assert the same claims for relief.

156. Adequacy. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this Action on behalf of all Class Members, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of other Class Members.

157. Substantial Benefits. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in this Action that would preclude its maintenance as a class action.

## LEGAL CLAIMS

### COUNT I
### Breach of Implied Warranty of Merchantability
### (13 Pa.C.S.A. § 2314)

158. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

159. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

160. By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-infused turnout gear impliedly warranted to Plaintiff and Class Members who purchased PFAS-infused turnout gear from Defendants that the turnout gear was of merchantable quality and fit for its intended and ordinary purposes. 13 Pa.C.S.A. § 2314.

161. Defendants developed, manufactured, marketed, and sold PFAS and PFAS Turnout Gear as alleged herein.

162. Defendants' PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous so that its mere presence causes serious health risk to firefighters and other exposed persons.

163. PFAS Turnout Gear is not reasonably safe, and it fails to perform as safely as an ordinary user would expect and its risks far outweigh any utility.

164. All Defendants contributed to the defective and dangerous condition of the PFAS Turnout Gear.

165. Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of PFAS-infused turnout gear. The turnout gear contained toxic levels of PFAS chemicals, rendering them unsuitable and unsafe for their ordinary purposes.

166. Had Plaintiff and Class Members known the PFAS-infused turnout gear they were purchasing was unsafe for its ordinary uses, they would not have purchased the products. 1045. Pennsylvania Class members reasonably expected, at the time of purchase, that the PFAS-infused turnout gear was safe for its intended and ordinary purposes.

167. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Plaintiff and Class Members will need to replace and dispose of all PFAS-infused turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and they have sustained damages in an amount to be determined at trial.

168. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Plaintiff and Class Members have suffered losses in an amount to be determined at trial.

**COUNT II**
**Strict Product Liability (Design Defect)**

169. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

170. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

171. At all relevant times, Defendants were engaged in the business of selling PFAS molecules, PFAS Chemical Finishes, and/or PFAS Turnout Gear.

172. At all relevant times, Defendants manufactured and sold to Plaintiff and members of the Class unreasonably dangerous PFAS Turnout Gear.

173. Defendants' PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous such that its mere presence causes serious health risk to firefighters and other exposed persons.

174. PFAS Turnout Gear is unreasonably dangerous and fails to perform as safely as an ordinary user would expect, and its risks far outweigh any utility.

175. Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Plaintiff and Class Members, who might foreseeably be harmed by PFAS Turnout Gear.

176. PFAS Turnout Gear is unreasonably dangerous for its foreseeable uses and misuses because it contains highly toxic PFAS which migrate and contaminate the surrounding environment, property, firefighters, and other exposed persons, as set forth herein.

177. Firefighting activities involve exposure to extreme stressors that are known to result in increased concentrations of PFAS, as well as accelerated migration and contamination.

178. Defendants designed and manufactured PFAS Turnout Gear to include high concentrations of toxic PFAS in the structural components, as well as additional PFAS

added through finishing sprays, adhesives, and reinforcements. The concentration of PFAS in Turnout Gear is far higher than in any other occupational gear.

179. Defendants added high concentrations of PFAS to PFAS Turnout Gear that they knew or should have known would have significant exposure to extreme stressors that volatize PFAS and accelerate their concentration and migration out of the PFAS Turnout Gear, causing unreasonably dangerous contamination of surrounding property and persons.

180. PFAS Turnout Gear was in a defective condition that made it unreasonably dangerous when it left Defendants' control.

181. All Defendants contributed to and are responsible for the defective condition of the PFAS Turnout Gear and had knowledge of its existence at the time it left their control.

182. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property; as well as personal injury to their firefighters and others. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property and harmful and dangerous exposure of its firefighters and other exposed persons to catastrophic harms to health such as cancer.

**COUNT III**
**Strict Product Liability (Failure to Warn)**

183. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

184. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

185. At all relevant times, Defendants were engaged in the business of selling PFAS molecules, PFAS Chemical Finishes, and PFAS Turnout Gear.

186. At all relevant times, Defendants manufactured and sold to Plaintiff and Class Members the unreasonably dangerous PFAS Turnout Gear.

187. Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products. Defendants' duty to warn extended to all third parties who might foreseeably be harmed by the ordinary use and misuse of their products, including Plaintiff and Class Members.

188. Defendants had a duty to warn about the addition of PFAS to their PFAS Turnout Gear; the migration of PFAS out of PFAS Turnout Gear; PFAS contamination of the surrounding environment, property, and persons; and the known risks of PFAS exposure and unreasonable hazards to human health.

189. Defendants had superior knowledge of the toxicity and risks of PFAS generally and PFAS Turnout Gear, as well as the risks associated with its use by Plaintiff and Class Members.

190. Defendants' inadequate warnings and instructions rendered the PFAS Turnout Gear purchased by Plaintiff and Class Members defective and not reasonably safe.

191. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the existence of PFAS in

their Turnout Gear, the dangers of PFAS, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

192. Defendants' PFAS Turnout Gear was defective by virtue of its inadequate warnings at the time it left Defendants' control; and the PFAS Turnout Gear reached Plaintiff, Class Members, and other end users without substantial change in their condition.

193. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Plaintiff and the Class Members, who would have heeded legally adequate warnings about the dangers of PFAS in PFAS Turnout Gear.

194. At all relevant times, Plaintiff and Class Members used their PFAS Turnout Gear as intended.

195. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property; as well as personal injury to their firefighters and others. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property and harmful and dangerous exposure of its firefighters and other exposed persons to catastrophic harms to health such as cancer.

## COUNT IV
## Fraudulent Misrepresentation/Concealment

196. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

197. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

198. Defendants represented that the PFAS Turnout Gear was safe and suitable for use by firefighters and/or concealed the fact that the PFAS Turnout Gear contained dangerous PFAS that could contaminate property.

199. Defendants knew or believed their statements to be false and/or that they were concealing material facts.

200. Defendants knew or should have known about the dangers of PFAS in their PFAS Turnout Gear and the unreasonably dangerous risks to human health caused by PFAS migration and contamination.

201. Defendants made these representations and/or concealed these facts to induce Plaintiff and Class Members to purchase the PFAS Turnout Gear.

202. Plaintiff acted in reliance on the truth of Defendants' statements or the assumption that no material facts were concealed.

203. Plaintiff purchased and used the PFAS Turnout Gear based on Defendants' representations about its safety and suitability and/or the absence of warnings about the existence of PFAS in the PFAS Turnout Gear; migration of PFAS out of the PFAS Turnout Gear; PFAS contamination of the surrounding environment, property, and persons; and unreasonably dangerous risks to human health caused by PFAS contamination and exposure.

204. As a result of Plaintiff's and Class Members' reliance on Defendants' misrepresentations and/or concealment, Plaintiff's property was contaminated with PFAS, causing Plaintiff and Class Members to incur costs for property damage remediation and replacement of the contaminated Turnout Gear.

205. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property; as well as personal injury to their firefighters and others. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property and harmful and dangerous exposure of its firefighters and other exposed persons to catastrophic harms to health such as cancer.

**COUNT V**
**Negligence**

206. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

207. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

208. Defendants, as the manufacturers and suppliers of PFAS Turnout Gear, owed Plaintiff and Class Members a duty to provide safe equipment that would not cause property damage, contamination, or unreasonable risk to human health.

209. Defendants breached their duty by manufacturing and/or supplying PFAS Turnout Gear containing dangerous PFAS that migrated out of the PFAS Turnout Gear and contaminated the surrounding environment, property, and persons with highly toxic and carcinogenic PFAS which present an unreasonable danger to human health and safety.

210. Defendants' breach was the proximate cause of Plaintiff Class Members' injuries.

211. Plaintiff and the Class Members have incurred costs for property damage remediation and replacement of the contaminated Turnout Gear.

212. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property; as well as personal injury to their firefighters and others. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property and dangerous exposure of its firefighters and other exposed persons to catastrophic harms to health such as cancer.

## COUNT VI
## Unjust Enrichment

213. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

214. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

215. Defendants' conduct alleged herein as resulted in their reaping benefits and wrongful receipt of profits.

216. Plaintiff and Class Members paid for PFAS Turnout Gear that they believed was safe and would not cause property contamination and unreasonably dangerous exposure to toxins that are harmful to human health.

217. Plaintiff and Class Members instead received highly toxic, unsafe, and unreasonably dangerous PFAS Turnout Gear that caused physical injuries and property

damage and that will continue to cause such injuries until it is destroyed and disposed of properly.

218. Defendants' retention of profits from PFAS Turnout Gear violates the fundamental principles of justice, equity, and good conscience.

219. The benefits Defendants received were to Plaintiff and Class Members' detriment.

220. Accordingly, Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of Plaintiffs and the Class.

221. As a result of Defendants' wrongful conduct, Plaintiff and Class Members are entitled to an institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants, and restitution from the same.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of itself and all Class Members, respectfully requests this Court render judgment in their favor against Defendants, jointly and severally, and grant Plaintiff and the Class the following equitable and monetary relief:

A. Certification of the proposed Class;

B. Appointment of the undersigned counsel for the proposed Class;

C. Compensatory damages for physical injuries and property damage caused by the PFAS Turnout Gear in an amount to be determined at trial;

D. Damages for the costs to properly retrieve, remove, destroy, and dispose of PFAS Turnout Gear an amount to be determined at trial;

E. Damages against Defendants for the cost of replacing all PFAS Turnout Gear in an amount to be determined at trial;

F. Restitution of all amounts by which Defendants were unjustly enriched, including revenues received related to PFAS Turnout Gear, in an amount to be determined at trial;

G. Punitive damages against Defendants in an amount to be determined at trial;

H. Attorneys' fees and costs;

I. Pre-judgment and post-judgment interest as allowed by law; and

J. Any and all such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and Class Members, demands a trial by jury as to all issues triable as of right.

Dated: October 22, 2026

/s/ *Jon A. Tostrud*
Jon A. Tostrud (MN Bar No. 0251768)
Anthony M. Carter (*pro hac vice forthcoming*)
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

Erik H. Langeland (*pro hac vice forthcoming*)
**ERIK H. LANGELAND, P.C.**
733 Third Avenue, 16th Floor
New York, NY. 10017
Telephone: (212) 354-6270
elangeland@langelandlaw.com

*Attorneys for Plaintiff and the Proposed Class*